RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 5 / 14 / 14

UNITED STATES DISTRICT COURT                          b

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| TEISHA TANNEE PRUDHOMME,<br>    Appellant | CIVIL ACTION<br>NO. 2:12-CV-03062 |
| VERSUS | |
| CAROLYN W. COLVIN, ACTING<br>COMMISSIONER OF SOCIAL SECURITY,<br>    Appellee | JUDGE JAMES T. TRIMBLE<br>MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Teisha Tanee Prudhomme ("Prudhomme") filed an application for disability insurance benefits ("DIB") on March 5, 2010, when she was 32 years old, alleging a disability onset date of February 2, 2010 (Tr. p. 104) due to heart problems and diabetes (Tr. p. 123). That application was denied by the Social Security Administration ("SSA") (Tr. p. 60).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on April 19, 2011 at which Prudhomme appeared with her representative and a vocational expert ("VE") (Tr. p. 10). The ALJ found that, although Prudhomme suffers from severe impairments of severe cardiomyopathy[1] and diabetes mellitus, she has the residual

---

[1] Cardiomyopathy is the name for diseases of the heart muscle. These diseases enlarge your heart muscle or make it thicker and more rigid than normal. In rare cases, scar tissue replaces the muscle tissue.  Some people live long, healthy lives with cardiomyopathy. Some people don't even realize they have it. In others, however, it can make the heart less able to pump blood through the body. This can cause serious complications, including heart failure, abnormal heart rhythms, heart valve problems, and sudden cardiac arrest.  MEDLINEplus Health Information, "Cardiomyopathy", *available at* http://www.nlm.nih.gov/

functional capacity to perform sedentary work except that she can only occasionally balance, stoop, kneel, crouch, and crawl, she can do less than occasional climbing of ramps and stairs, she cannot climb ladders, ropes or scaffolds, she must avoid all exposure to fumes, odors, dust and gases, and she must avoid concentrated exposure to temperature extremes, wetness, humidity and vibration (Tr. pp. 49-50).   The ALJ found that Prudhomme can perform work such as sedentary level cashier, receptionist/information clerk, or interview clerk and, therefore, Prudhomme was not under a disability as defined in the Social Security Act at any time from February 2, 2010 (the alleged disability onset date) through the date of his decision on May 17, 2011 (Tr. p. 55).

Prudhomme requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 6), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Prudhomme next filed this appeal for judicial review of the Commissioner's final decision.   Prudhomme raises the following issues for review (Doc. 12):

> 1.   The ALJ posited a defective Step 5 hypothetical question to the Vocational Expert; the expert's responses thereto cannot constitute substantial evidence upon which to base this Step 5 denial.
>
> 2.   The Vocational Expert provided defective Step 5 testimony; the VE's responses therefore cannot constitute substantial evidence upon which to base this denial.
>
> 3.  The ALJ failed to comply with the Commissioner's

---

medlineplus/cardiomyopathy.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

binding ruling, SSR 00-4p.

The Commissioner filed a brief in opposition to the appeal (Doc. 13), to which Prudhomme filed a reply (Doc. 14). Prudhomme's appeal is now before the court for disposition.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

Prudhomme was 33 years old at the time of her April 2011 administrative hearing (Tr. p. 122), she had a high school education and training as a Certified Nursing Assistant (Tr. p. 124), and she had past work experience as a cashier/cook at a restaurant (1999-2010) (Tr. p. 124).

## 1. Medical Records

In May 2009, Prudhomme was seen at the emergency room because she was not feeling well, she was weak, tired and losing weight

(Tr. p. 413).  Prudhomme had a greater than 1000 glucose level in her urine and she was volume-depleted; she was admitted with new onset diabetes (Tr. p. 413).  Prudhomme was given Glucophage and Amaryl and her glucose level went down to 175 (Tr. pp. 413-414).

In late December 2009, Prudhomme went to the emergency room, complaining that, while she was washing the dishes, she had chest pain that started in her jaw and radiated down her left arm, along with mild shortness of breath, then the pain became substernal and radiated down her left arm, and was not relieved by rest (Tr. p. 402).  Prudhomme also stated that her father had a myocardial infarction at age 45 (Tr. p. 402).  An x-ray of Prudhomme's chest did not show any definite evidence of acute cardiopulmonary disease, but further evaluation was recommended (Tr. p. 409).

In late January 2010, Prudhomme went to the emergency room, complaining of shortness of breath, coughing, congestion, and back and neck pain (Tr. pp. 396-399).  A chest x-ray showed cardiomegaly with normal vasculature and no active infiltrates in either lung (Tr. p. 401).  Prudhomme was prescribed cough medicine (Tr. pp. 396-399).

On February 3, 2010, Prudhomme was admitted to the hospital for complaints of shortness of breath (Tr. p. 204).  Prudhomme was 5'1" tall and weighed 121 pounds (Tr. p. 254), and reported a history of Type 2 diabetes and hypertension (Tr. p. 204).  It was noted that Prudhomme had been noncompliant with checking her glucose and following up at the lab (Tr. p. 225); her glucose was high at 135 and 144 (Tr. pp. 384, 394).  Dr. Miguel A. Depuy, a

4

cardiovascular disease specialist, did a cardiology stress test that showed anterior and posterior perfusion consistent with fibrosis and an ejection fraction of 17 percent (Tr. p. 226).  Dr. Depuy also did an echocardiograph which was abnormal; it showed very poor contractility of the left ventricle and a left ventricular ejection fraction of less than 20 percent (Tr. pp. 198-199, 210, 227, 232-233, 285, 335).  A CT scan and angiogram of Prudhomme's chest showed right pleural effusion with cardiomegaly and dilation of the left ventricle suggesting congestive heart failure (Tr. pp. 230, 277).  An X-ray of Prudhomme's chest showed her heart was enlarged (Tr. pp. 207, 279).  Her glucose level was high at 144 (Tr. p. 206).  Prudhomme's right leg had pain and swelling, and a venous ultrasound showed extensive femoral-popliteal deep vein thrombosis[2] (Tr. pp. 275, 334).  A left and right heart catheterization, right and left coronary arteriograms, and a left ventriculogram showed normal coronary arteries, showed poor left ventricular systolic function, consistent with dilated cardiomyopathy, and inferoapical thrombus (blood clot) (Tr. pp. 282-283).

Dr. Depuy diagnosed congestive heart failure secondary to dilated cardiomyopathy, and started her on several medications

---

[2] Deep vein thrombosis, or DVT, is a blood clot that forms in a vein deep in the body. Most deep vein clots occur in the lower leg or thigh.  A deep vein thrombosis can break loose and cause a serious problem in the lung, called a pulmonary embolism. MEDLINEplus Health Information, "Deep Vein Thrombosis," *available at* http://www.nlm.nih.gov/medlineplus/ deepveinthrombosis.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

including Toprol, Lasix, IV Dabutamine, ACE inhibitors, and beta blockers (Tr. pp. 223, 289).  Prudhomme's diagnoses on discharge from the hospital, on February 15, 2010, were severe dilated cardiomyopathy, left ventricular thrombus and right lower extremity popliteal deep venous thrombosis, congestive heart failure, diabetes mellitus, and constipation (Tr. pp. 280-281).  Prudhomme was prescribed Coumadin, Coreg, Lisinopril, Aldactone, and Colace (Tr. p. 280).

On March 1, 2010, Kelly Murray, a family nurse practitioner, wrote that Prudhomme was under her care for dilated cardiomyopathy, new onset congestive heart failure, hypertension, and diabetes mellitus Type II, and required medical management of her congestive heart failure and decreased ejection fraction (Tr. p. 219).  Murray also wrote that Prudhomme had developed a blood clot to her right leg and was on bed rest under the care of Dr. Depuy (Tr. p. 219).  On examination, Prudhomme was found to weight 125 pounds, her blood pressure was 90/54, she reported mild pain in her right leg, her glucose was 181, and she did not have shortness of breath or chest pain (Tr. p. 220).  Prudhomme was advised to continue her medications and to monitor and record her glucose (Tr. p. 221).

On March 8, 2010, Prudhomme reported that she was feeling much better, her shortness of breath was better, and the Lasix was working well (Tr. p. 218).  Prudhomme had slight pain in her right leg but it was slowly getting better (Tr. p. 218).

On May 7, 2010, Prudhomme was evaluated by Dr. Lan Luo and Dr. Thiery H. Lejemtel at the Tulane University Hospital and Clinic

(Tr. pp. 293-294).   Prudhomme reported that she could walk for to five blocks without shortness of breath, and denied syncope or presyncope episodes or lower extremity edema (Tr. p. 293). Prudhomme was 5'1" tall and weighed 121 pounds (Tr. p. 293).   Dr. Lejemtel found that Prudhomme was New York Heart Association Class II,[3] with good exercise capacity and functional capacity (Tr. pp. 293-294).   A heart transplant was discussed as a future treatment option, changes in Prudhomme's medications were recommended, and she was advised to return in one month for further studies and to follow up with Dr. Depuy (Tr. pp. 293, 298).

In June 2010, Prudhomme underwent a pulmonary exercise test, which she terminated early due to "muscle fatigue" (Tr. pp. 302-314).

---

[3] Doctors usually classify patients' heart failure according to the severity of their symptoms.  The New York Heart Association (NYHA) Functional Classification.  It places patients in one of four categories based on how much they are limited during physical activity:
> I. Patients with cardiac disease but resulting in no limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea or anginal pain;

II. Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain;
III. Patients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain;
IV. Patients with cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest.  If any physical activity is undertaken, discomfort increases. American Heart Association, "Classes of Heart Failure," *available at* http://www.heart.org/HEARTORG/Conditions/HeartFailure/About HeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp.

Prudhomme also returned to the Tulane University Hospital and Clinic in June 2010, where she reported she can walk about half a mile without having any shortness of breath, she did not have lower extremity swelling or weight changes, and she did not have any syncope or presyncope, but she had occasional chest pain lasting about one or two seconds which would resolve on its own (Tr. p. 352). Prudhomme's Coreg dosage and Aldactone dosage were increased (Tr. p. 352).

Also in June 2010, Prudhomme's glucose was normal (87) (Tr. pp. 367, 369).

In July 2010, Dr. Depuy noted that Prudhomme has dilated non-ischemic cardiomyopathy and refractory congestive heart failure, was taking her maximum tolerated drug therapy including ACE inhibitors, Aldactone, and Coreg, as well as chronic anticoagulation with Coumadin, and diabetes medication (Tr. pp. 336, 344). Dr. Depuy stated that Prudhomme had been unable to return to work because of symptomatic heart failure (Tr. pp. 336, 344). Dr. Depuy noted that Prudhomme had attended the heart failure clinic in Tulane for consideration of a heart transplant, but was turned down because her functional capacity was "relatively good" (Tr. pp. 336, 344). Dr. Depuy stated that Prudhomme continues to experience dyspnea on exertion and overall easy fatigability, but did not have true syncope, palpitations, or paroxysmal nocturnal dyspnea (Tr. pp. 336, 344). An electrocardiogram that date showed a sinus rhythm with occasional PVCs, and an echocardiogram showed a severely dilated left

8

ventricle with lower hypokenesis, an estimated ejection fraction of 25 percent, and mild to moderate mitral regurgitation (Tr. pp. 336, 344). Dr. Depuy noted that Prudhomme's pulmonary pressure was normal and her ejection fraction had improved from 20 percent to 25 percent (Tr. pp. 336, 344). Dr. Depuy continued her medications (Tr. pp. 336, 344).

In August 2010, Prudhomme's glucose was high (121) (Tr. p. 361).

Prudhomme returned to the Tulane University Hospital and Clinic on October 22, 2010, where Dr. Mallela and Dr. Lejemtel increased the Coreg dosage and recommended an AICD (automatic internal cardioverter defibrillator), which Prudhomme declined at that time, stating that she wanted to think about it (Tr. p. 350). They noted that Prudhomme said she could walk up to eleven blocks without shortness or breath, and she had not had any leg swelling, chest pain, or palpitations (Tr. p. 350).

On October 26, 2010, Dr. Depuy wrote that Prudhomme had taken an anticoagulant for nine months, was feeling better, and her functional capacity was improved; he continued her on Coreg, Lisinopril, and Aldactone (Tr. p. 345). Dr. Depuy noted that Prudhomme's chronic congestive heart failure was improved (Tr. p. 345).

In January 2011, Prudhomme's glucose was at a normal level (Tr. p. 356).

### 2. 2011 Administrative Hearing

At her April 19, 2011 administrative hearing, Prudhomme

testified that she lives in Jennings, Louisiana with her husband and four children, ages 15, 12, 12, and 7 (Tr. p. 16).

Prudhomme testified that, when she went to Tulane Hospital the first time, she was seen by Dr. Lejemtel[4] and a "female Asian doctor" and she told them she could walk four to five blocks without shortness of breath (Tr. p. 39).  When she went to Tulane Hospital the second time, in June 2010, Prudhomme was seen by Dr. Lejemtel (Tr. p. 39).  The ALJ read from Dr. Lejemtel's notes that Prudhomme said she could walk half-a-mile without having any shortness of breath; Prudhomme testified that she could not have walked half a mile (Tr. pp. 39-40).

Prudhomme testified that, when she went to Tulane Hospital in October 2010, she did not actually meet with Dr. Lejemtel, as reflected in the medical record written by Dr. Mallela, because he was resting somewhere, but another doctor spoke to her (Tr. p. 21). Prudhomme testified that the doctor wanted her to return in six weeks, but she told him she had to wait until January because Medicare would not pay for another visit before then (Tr. p. 19). Prudhomme also testified that she did not tell the Tulane doctor that she can walk up to eleven blocks without shortness of breath because she cannot do that (Tr. p. 36).  Prudhomme testified that the doctor talked to her about getting a defibrillator, and she told him that she wanted to think about it and talk to Dr. Depuy before she decided; according to Prudhomme, Dr. Depuy later spoke

---

[4] Dr. Lejemtel's name is consistently misspelled in the hearing transcript as "Lingentel".

with the doctors at Tulane and they all agreed to wait a year (Tr. pp. 21-23).   The ALJ then read Dr. Depuy's report aloud to Prudhomme, which stated that Prudhomme would be re-evaluated in January 2011 and, at that time, they would decide if she needed a defibrillator or a heart transplant (Tr. p. 23).

Prudhomme testified that, on a normal day, she gets her children ready for school, does some chores, picks up her sister from school, and then her sister drives her around if she needs to go somewhere, such as the grocery store, and helps her with heavy work that Prudhomme cannot do, such as mopping the floor (Tr. p. 24).   Prudhomme testified that she is able to take care of her personal hygiene, can cook a light meal, can walk three or four blocks before she has shortness of breath or chest pain, and can lift up to about thirty pounds (not frequently) (Tr. pp. 24-25). Prudhomme testified that her representative drove her to the administrative hearing (Tr. p. 30).

Prudhomme testified that, if she cannot do something, her mother, sister or oldest daughter do it for her (Tr. p. 25). Prudhomme testified that she can only do light grocery shopping by herself, so her sister goes with her if she needs to get a lot of groceries (Tr. p. 25).   Prudhomme testified that, since she developed her heart condition, she forgets things and is stressed because she cannot do things for her children (Tr. p. 25).

Prudhomme testified that Dr. Depuy said she is in a "gray area" insofar as working because she cannot get excited and she needs a defibrillator in her heart; working could strain her heart

and worsen her condition (Tr. p. 26). Prudhomme testified that her heart condition has improved somewhat with her medication regimen, but her functional capacity, for walking and such, has not improved and her memory lapses are becoming more frequent (Tr. p. 26). Prudhomme also testified that she has to monitor her diabetes to make sure her glucose level does not get too high; sometimes it goes up even without her eating anything (Tr. p. 26). Prudhomme testified that she controls her diabetes with medication and diet (Tr. p. 27).

Prudhomme testified that she did a cardiac stress test at Tulane, but she was unable to complete it and was told that she would need to do another one, but it was never scheduled (Tr. p. 37). Prudhomme testified that her heart function increased over the last year with medication, but her physical functioning has not improved due to medication side effects (Tr. pp. 37-38). Prudhomme testified that she has side effects of memory problems, agitation, and frequent bouts of crying (Tr. p. 38).

Prudhomme testified that she worked as a short order cook for ten years (Tr. p. 25). Prudhomme testified that she tried to return to work one day, just to see if she could do it, but she had to leave after a couple of hours (Tr. p. 27). Prudhomme testified that, as a short order cook, she put away groceries, ordered groceries, took orders at the counter, and made burgers, salads, and fried chicken (Tr. p. 27). Prudhomme testified that she was on her feet all day, with a lot of reaching, stooping, and bending (Tr. p. 27), and that she cannot do any of that now (Tr. p. 28).

Prudhomme testified that she is no longer able to work as a Certified Nursing Assistant, either (Tr. p. 29). Bending for a little while makes her legs get numb, standing too long gives her leg cramps even if she wears support stockings, and sitting makes her back hurt (Tr. p. 28). Prudhomme testified that she was short of breath and had chest pain when she walked from her car in the parking lot to the elevator in the Social Security building, and that she had to stop and rest when she went to look for a bathroom (Tr. p. 28).

Prudhomme testified that her children help her at home, but there are some things they cannot do and there are some things she can no longer do (Tr. p. 28). Prudhomme testified that her husband works during the day, so he is not able to help her then (Tr. p. 29).

Prudhomme testified that she feels depressed but is not taking medication for depression, and she has lost forty to fifty pounds since finding out about her heart condition (Tr. p. 29). Prudhomme testified that Dr. Depuy told her she should not work at all (Tr. p. 29).

The Vocational Expert ("VE") testified that Prudhomme has done three types of work in the past, as a cashier (light duty, unskilled, SVP 2), short order cook (light duty, semi-skilled, SVP 3), and certified nursing assistant (medium duty, semi-skilled, SVP 4) (Tr. p. 32).

The ALJ posed a hypothetical involving a person of Prudhomme's age, work history and education, who can do sedentary work but can

13

never climb ladders, rope or scaffolds, can less than occasionally climb ramps and stairs, can only occasionally balance, stoop, kneel, crouch and crawl, must avoid all exposure to work-place hazards such as machinery and heights, and must avoid concentrated exposure to temperature extremes, wetness, humidity, and vibration (Tr. p. 32).   The VE testified that such a person can work as a sedentary cashier (unskilled to semi-skilled, DOT 211.482-010, 10,800 jobs in Louisiana and 660,000 jobs in the nation), a receptionist and information clerk (DOT 237.367-022, sedentary, semi-skilled, 1900 jobs in Louisiana and 142,000 jobs in the nation), or an interview clerk (outpatient administrative clerk) (DOT 205.362-030, sedentary, SVP 4,[5] 490 jobs in Louisiana and 73,000 jobs in the nation) (Tr. pp. 32-33).

The VE further testified that, if the claimant could not be exposed to stress (such as stress caused by an unhappy customer) because it could cause heart palpitations, shortness of breath or chest pain, she would not be able to do any of those jobs (Tr. p. 35).

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential

---

[5] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. See <u>Dictionary of Occupational Titles</u> ("DOT"), App. C (rev. 4th ed. 1991).  Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher.  Social Security Ruling 00-4p, 2000 WL 1898704, at *3 (2000).  See also generally 20 C.F.R. § 404.1568.

process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Prudhomme (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Prudhomme has not engaged in substantial gainful activity since February 2, 2010 (Tr. p. 49), and she has severe impairments of severe cardiomyopathy and diabetes mellitus, but she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 20). The ALJ also found that

15

Prudhomme is unable to perform her past relevant work as a cashier, a short order cook, and a certified nursing assistant (Tr. p. 54).

At Step No. 5 of the sequential process, the ALJ further found that Prudhomme has the residual functional capacity to perform the full range of sedentary work with the additional limitations of no more than occasional balancing, stooping, kneeling, crouching, and crawling, less than occasional climbing of ramps and stairs, no climbing on ladders, ropes or scaffolds, she must avoid all exposure to fumes, odors, dust and gases, and she must avoid concentrated exposure to temperature extremes, wetness, humidity and vibration (Tr. p. 50).  The ALJ found that the claimant is a younger individual with at least a high school education and that the transferability of work skills was not relevant to the disability determination (Tr. p. 54).  The ALJ concluded that there are a significant number of jobs in the national economy which Prudhomme can perform, such as sedentary level cashier, receptionist/information clerk, and interview clerk and, therefore, Prudhomme was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on May 17, 2011.

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  <u>McQueen v. Apfel</u>, 168

F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law.  Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988);

Dellolio, 705 F.2d at 125.

Law and Analysis

Issue 1 – Hypothetical Question

First, Prudhomme contends the ALJ posited a defective Step Five hypothetical question to the Vocational Expert and argues the VE's responses cannot constitute substantial evidence on which to base her step five denial.  Specifically, Prudhomme argues that the ALJ failed to include her severe impairments of severe cardiomyopathy and diabetes mellitus in his hypothetical to the VE.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting.  Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations.  20 C.F.R. §404.1545, §416.945.  Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy.  Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein.  Also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984).  The Commissioner has the burden to establish a claimant's residual functional capacity.  Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual

18

functional capacity.  20 C.F.R. § 404.1546, § 416.946.  The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination.  Social Security Ruling 96-8p.  S.S.R. 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."

The Fifth Circuit has consistently held that once the ALJ determines that a claimant suffers from a nonexertional impairment that prevents him from performing his past relevant work, the Commissioner must produce expert vocational testimony or other similar evidence to establish that other jobs exist in the national economy that the claimant can perform.  Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986), and cases cited therein.  The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.  A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job.  Fields, 805 F.2d at 1170.  Testimony from a vocational expert is substantial evidence when the testimony is based on a correctly phrased hypothetical question that captures the concrete *consequences* of a claimant's impairments.  Taylor v. Chater, 118 F.3d 1274 (8th Cir. 1997).  Since functional limitations

may differ substantially between claimants with the same medical condition, the nature and degree of a claimant's functional limitations must be described in the hypothetical to the VE, rather than simply the name of the claimant's medical condition.  Thus, the VE is concerned with the functional limitations (consequences) caused by the claimant's medical conditions (impairments).

In the case at bar, the ALJ's hypothetical to the VE included the functional limitations caused by Prudhomme's severe impairments.  That is all that was necessary.  Prudhomme has not alleged any functional limitations that were omitted from the hypothetical by the ALJ.  Since the ALJ included Prudhomme's functional limitations in the hypothetical to the VE, the VE's testimony is substantial evidence which supports the ALJ's finding that Prudhomme was not disabled at the time of his decision.

Prudhomme further argues that the ALJ erred in including an additional limitation to the hypothetical, of avoiding all exposure to workplace hazards such as machinery and heights, that is not in his residual functional capacity finding.  However, Prudhomme has not alleged how she was prejudiced by the ALJ asking a hypothetical with a more restrictive residual functional capacity assessment than her actual residual functional capacity.  Since Prudhomme cannot show prejudice from the ALJ's error, this argument is meritless.  See Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988); Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).

Prudhomme also contends, erroneously, that the ALJ excluded the limitation to avoid all exposure to fumes, odors, dust and

gases from his hypothetical to the VE.   That limitation was included in the hypothetical (Tr. p. 32).

Therefore, this issue is meritless.

Issue 2 - VE's Testimony

Next, Prudhomme contends the VE provided defective Step Five testimony.   Therefore, the VE's responses cannot constitute substantial evidence upon which to base the denial of benefits. Specifically, Prudhomme contends that, although the ALJ found that "transferability of job skills is not material to the determination of disability," the jobs cited by the VE are semi-skilled jobs.

In Social Security Ruling 82-41, 1982 WL 31389, *2 & *5 (S.S.A.), the SSA explained transferability:

> "What 'transferability' is.   Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs. Transferability is distinct from the usage of skills recently learned in school which may serve as a basis for direct entry into skilled work (Appendix 2, section 201.00(g)).
>
> \*                    \*                    \*
>
> "Where transferability is at issue, it is most probable and meaningful among jobs in which: (1) the same or a lesser degree of skill is required, because people are not expected to do more complex jobs than they have actually performed (i.e., from a skilled to a semiskilled or another skilled job, or from one semiskilled to another semiskilled job); (2) the same or similar tools and machines are used; and (3) the same or similar raw materials, products, processes or services are involved. A complete similarity of all these factors is not necessary.  There are degrees of transferability ranging from very close similarities to remote and incidental similarities among jobs."

The pertinent regulation, 20 C.F.R. § 404.1565(a), provides: "If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled."

See also, <u>Albritton v. Sullivan</u>, 889 F.2d 640, 643 (5th Cir. 1989) (a finding of non-materiality means the claimant effectively is unskilled because his skills are not transferable"). The ALJ in this case stated that "transferability of job skills is not material to the determination of disability" (Tr. p. 54). Therefore, the ALJ found that Prudhomme is effectively unskilled.

The VE listed three jobs which Prudhomme can do: sedentary cashier, which is unskilled to semi-skilled, receptionist/information clerk, which is semi-skilled, and interview clerk, which is semi-skilled (SVP 4).

In the case at bar, the VE identified three semi-skilled jobs for Prudhomme, despite the fact that the ALJ found she was effectively unskilled. However, the job of sedentary cashier is listed as unskilled work, as well as semi-skilled, so Prudhomme should be able to do that work. Moreover, it seems clear that Prudhomme's prior work as a cashier afforded her the skills necessary to perform work as a sedentary cashier.[6]

Therefore, since the VE identified at least one job which Prudhomme can perform (sedentary cashier), substantial evidence supports the Commissioner's finding that Prudhomme is not disabled.

This issue is meritless.

<u>Issue 3 - Conflict with the DOT</u>

Finally, Prudhomme contends, correctly, that the ALJ failed to

---

[6] It appears the ALJ erred as a matter of law in finding that transferability of skills was not material to Prudhomme's disability determination. However, Prudhomme was not prejudiced by the error. See <u>Morris</u>, 864 F.2d at 335; <u>Mays</u>, 837 F.2d at 1364.

comply with the Commissioner's binding ruling, SSR 00-4p, which required him to ask the VE whether there were any possible conflicts between his testimony and the Dictionary of Occupational Titles ("DOT").  However, since Prudhomme has not pointed to any actual or implied conflicts between the VE's testimony and the DOT, Prudhomme has not shown prejudice arising from the ALJ's error. Therefore, this issue is meritless.  See <u>Morris</u>, 864 F.2d at 335; <u>Mays</u>, 837 F.2d at 1364.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Prudhomme's appeal be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of May 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE